FILED

2014 Sep-23  PM 04:45
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | | |
|---|---|---|
| **LEOPOLD BLAKLEY,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 7:13-CV-0449-KOB** |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| **ACTING COMMISSIONER OF** | ) | |
| **SOCIAL SECURITY** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

### I. INTRODUCTION

The claimant, Leopold Blakley, filed a Title II application for a period of disability and

disability insurance benefits on February 22, 2010, alleging disability commencing on July 24,

2009, because of osteoarthritis in the right knee, alcoholic hepatitis, borderline intellectual

functioning, sickle cell anemia, hypertension, and gastroesophageal reflux disease. (R. 21, 132).

The Commissioner denied the claim. (R. 83). The claimant filed a timely request for a hearing

before an Administrative Law Judge, and the ALJ held a video hearing on August 18, 2011, with

the claimant in Tuscaloosa and the ALJ in Birmingham, Alabama.  (R. 41, 43).

In a decision dated September 23, 2011, the ALJ found that the claimant was not disabled

within the meaning of the Social Security Act and, thus, was ineligible for disability insurance

benefits. (R. 19).  On appeal, the Appeals Council denied the claimant's request for review on

January 10, 2013. (R. 1). The claimant has exhausted his administrative remedies, and this court

has jurisdiction under 42 U.S.C. §§ 405(g) and 1631(c)(3). For the reasons stated below, this

1

court REVERSES and REMANDS the decision of the Commissioner because substantial

evidence does not support the ALJ's finding that the claimant did not meet Listing § 12.05(C).

## II. ISSUE PRESENTED

The issue before the court is whether substantial evidence supports the ALJ's finding that

the claimant did not meet Listing § 12.05(C).

## III. STANDARD OF REVIEW

The standard for reviewing the Commissioner's decision is limited. This court must affirm

the Commissioner's decision if the Commissioner applied the correct legal standards and if the

factual conclusions are supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Graham v.*

*Apfel,* 129 F.3d 1420, 1422 (11th Cir. 1997); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

"No . . . presumption of validity attaches to the [Commissioner's] legal conclusions,

including determination of the proper standards to be applied in evaluating claims." *Walker*, 826

F.2d at 999. This court does not review the Commissioner's factual determination *de novo*. The

court will affirm those factual determinations that are supported by substantial evidence.

"Substantial evidence" is "more than a mere scintilla. It means that such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402

U.S. 389, 401 (1971).

The court must keep in mind that opinions such as whether a claimant is disabled, the

nature and extent of a claimant's residual functional capacity, and the application of vocational

factors "are not medical opinions, . . . but are, instead, opinions on issues reserved to the

Commissioner because they are administrative findings that are dispositive of a case; i.e., that

would direct the determination or decision of disability." 20 C.F.R. §§ 404.1527(d), 416.927(d).

Whether the claimant meets the listing and is qualified for Social Security disability benefits is a question reserved for the ALJ, and the court "may not decide facts anew, reweigh the evidence, or substitute [its] judgment for that of the Commissioner." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005). Thus, even if the court were to disagree with the ALJ about the significance of certain facts, the court has no power to reverse that finding as long as substantial evidence in the record supports it.

The court must "scrutinize the record in its entirety to determine the reasonableness of the [Commissioner]'s factual findings." *Walker*, 826 F.2d at 999. A reviewing court must not look only to those parts of the record that support the decision of the ALJ, but also must view the record in its entirety and take account of evidence that detracts from the evidence relied on by the ALJ. *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986).

## IV. LEGAL STANDARD

Under 42 U.S.C. § 423(d)(1)(A), a person is entitled to disability benefits when the person cannot "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To make this determination, the Commissioner employs a five-step sequential evaluation process:

> (1) Is the person presently unemployed?
> (2) Is the person's impairment severe?
> (3) Does the person's impairment meet or equal one of the specific impairments
>  set forth in 20 C.F.R. pt. 404, subpt. P, app. 1?
> (4) Is the person unable to perform his or her former occupation?
> (5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next
question, or, on steps three and five, to a finding of disability. A negative answer
to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen,* 800 F.2d 1026, 1030 (11th Cir. 1986); 20 C.F.R. §§ 404.1520, 416.920.

To meet Listing § 12.05 for "mental retardation[1]," the claimant must have "significantly

subaverage general intellectual functioning with deficits in adaptive functioning initially

manifested during the developmental period; i.e., the evidence demonstrates or supports onset of

the impairment before age 22." Listing § 12.05; *see also Perkins v. Comm'r, Soc. Sec. Admin.,*

No. 13-12024, 2014 WL 223905 at *2 (11th Cir. Jan 22, 2014) (quoting *Crayton v. Callahan*, 120

F.3d 1217, 1219 (11th Cir. 1997)). To meet the required level of severity in § 12.05(C), the

claimant must show "[a] valid verbal, performance, or full scale IQ of 60-70 and a physical or

other mental impairment imposing an additional and significant work-related limitation of

function[.]" The additional mental or physical impairment must have more than a "'minimal

effect' on the claimant's ability to perform basic work activities." *Smith v. Comm'r of Soc. Sec.,*

535 F. App'x 894, 897 (11th Cir. 2013) (emphasis added) (quoting *Lowery v. Sullivan,* 979 F.2d

835, 837 (11th Cir. 1992)).

Because the IQ score is essential in evaluating § 12.05(C), the Eleventh Circuit provides

guidance for an ALJ in how to properly consider an IQ score. The Eleventh Circuit established

that a valid IQ score of 60 to 70 creates a rebuttable presumption of "a fairly constant IQ score

---

[1] As the Eleventh Circuit has recognized, "[o]n August 1, 2013, . . . the [SSA] amended Listing
12.05 by replacing the words 'mental retardation' with 'intellectual disability.' This change was made
because 'the term "mental retardation" has negative connotations,' and 'has become offensive to many
people.' The [SSA] stated that the change 'does not affect the actual medical definition of the disorder or
available programs or services.'" *Hickel v. Comm'r of Soc. Sec.,* 539 F. App'x. 980, 982 n.2 (11th Cir.
2013) (citations omitted). Because the ALJ and parties used the term "mental retardation" in the present
case, the court will use those terms to avoid confusion.

throughout [his or] her life[,] absent evidence of sudden trauma that can cause retardation," thus,

indicating that the deficits in adaptive functioning manifested before the age of twenty-two.

*Hodges v. Barnhart*, 276 F.3d 1265, 1268-69 (11th Cir. 2001).

However, in *Popp v. Heckler,* the Eleventh Circuit held that "[t]he ALJ is required to

examine the results [of an IQ test] in conjunction with *other medical evidence and the*

*claimant's daily activities and behavior*[;]" an IQ score alone is not conclusive evidence of a

mental disability. 779 F.2d 1497, 1499-1500 (11th Cir. 1986) (emphasis added). The ALJ should

look to the narrative report that accompanies the IQ test results, as it "should comment on

whether the IQ scores are considered valid and consistent with the developmental history and the

degree of functional limitation." Listing § 12.00(D)(6)(a); *see also Hickel v. Comm'r of Soc. Sec.,*

539 F. App'x 980, 984 n.6 (11th Cir. 2013).

While the burden rests with the claimant to prove a disability, the ALJ has a duty to

develop a full and fair record. *Ellison v. Barnhart,* 355 F.3d 1272, 1276 (11th Cir. 2003); 20

C.F.R. § 416.912(c). When the evidence shows that the claimant has a mental impairment, the

ALJ may determine that the claimant is not disabled "'only if the [ALJ] has made every

reasonable effort' to obtain the opinion of a 'qualified psychiatrist of psychologist.'" *McCall v.*

*Bowen*, 846 F.2d 1317, 1320 (11th Cir. 1988) (quoting 42 U.S.C.A. § 421(h)); *see also* 20 C.F.R. §

416.903(e). Because the ALJ has a duty to develop the medical record fully and fairly, "it is

reversible error for an ALJ not to order a consultative examination when such an evaluation is

necessary for him to make an informed decision." *Holladay v. Bowen,* 848 F.2d 1206, 1209-10

(11th Cir. 1988); *see also Reeves v. Heckler,* 734 F.2d 519, 522 n.1 (11th Cir. 1984). The ALJ's

duty to order a consultative examination can be triggered when an inconsistency in the evidence

exists or the medical record as a whole does not support a determination on the disability claim. 20 C.F.R. § 416.903(a); 20 C.F.R. § 416.919.

Further, "[a]n ALJ . . . abuses his discretion when he substitutes his own uninformed medical evaluations for those of a claimant's treating physicians." *Maybury v. Sullivan,* 957 F.2d 837, 840 (11th Cir. 1991) (Johnson concurring).

## V. FACTS

The claimant dropped out of high school in the tenth grade and was forty-four years old at the time of the administrative hearing. His past work experience includes employment as a pipe layer, forklift operator, bander, lumber puller, concrete finisher, and packager. (R. 29). The claimant alleges that he is unable to work because of osteoarthritis in the right knee, alcoholic hepatitis, mild mental retardation, sickle cell anemia, hypertension, and gastroesophageal reflux disease. (R. 21).

In making her determination, the ALJ reviewed and considered the medical evidence and opinions relating to the claimant's physical limitations. The record does contain numerous medical records pertaining to the claimant's physical impairments of osteoarthritis in his right knee and alcoholic hepatitis, both of which the ALJ found to be severe impairments. (*See* R. 21). However, because the claimant, on appeal, only contests the ALJ's finding regarding his mental impairment, the court will not specifically address all of the facts in the record relating to the claimant's physical impairments.

### *Mental Limitations*

The record reflects that the claimant left high school before completing tenth grade. The claimant repeated the third and sixth grades and was in special education classes for his sixth

grade year. (R. 50-51).   During his ninth and tenth grade years, the claimant failed *nine* of his

high school courses; however, the school did not place him in special education classes during

high school. (R. 204). During high school, the claimant's standardized test scores reflected that he

was reading at a fifth grade level and that his math skills were at a fourth grade level. (R. 204).

On March 15, 2010, the claimant completed a Function Report—Adult at the request of

the Social Security Administration.  In the report, the claimant indicated that he could wash

dishes; clean; cook breakfast; watch TV; and had no problems with personal hygiene.  The

claimant checked "yes" in boxes that asked if was able to pay bills, count change, handle a

savings account, and use checkbook/money orders.  He also indicated that he enjoyed playing

dominoes every other weekend; could follow written instructions *if* he could understand them;

got along with authority figures "very well"; handles stress "very well"; and could handle

changes in routine well.  (R. 184-191).

Dr. John R. Goff, Ph.D., a clinical neuropsychologist, diagnosed the claimant with mild

mental retardation on July 27, 2011, at Riverside Medical Center in Tuscaloosa, AL. (R. 322).

Dr. Goff has been a practicing clincial psychologist and neuropsycologist since 1977, and has

maintained consulting relationships with numerous governmental agencies, including the

Disability Determination Service.  (R. 208).  The claimant visited Dr. Goff for a consultative

mental evaluation at the request of the claimant's attorney.

 In the "Behavioral Observations and Mental Status" section of his report, Dr. Goff

indicated that the claimant reported being in pain "all the time" because of his knee; feeling sad

sometimes but not talking about being depressed; and feeling like "people are working against his

interests." (R 324).  Dr. Goff also reported that the claimant left out the letter "X" when reciting

the alphabet; was able to count backwards from 20; made errors in performing serial three

addition; and could recall 10 out of 25 elements from a brief story.

As part of the examination, Dr. Goff reviewed the claimant's medical records and

administered several tests, including the Victoria Symptom Validity Test (VSVT) to assess the

claimant's tendency to malinger or engage in dissimulation.  The claimant scored a perfect 48/48

on the VSVT, indicating that the claimant was not malingering or dissimulating. Dr. Goff also

attempted to administer the Personality Assessment Inventory that contains validity indicators

within the test; however, the claimant's scores were invalid.  Dr. Goff noted that Personality

Assessment Inventory scores are usually found invalid in people with cognitive deficits similar to

the claimant, and that he believed that the claimant did not fully understand the questions on the

test.  Dr. Goff concluded that the claimant was not exaggerating as to his mental ability or his

degree of pain.  (R. 325).

Dr. Goff also administered the Wechsler Adult Intelligence Scale-IV IQ test that assessed

the claimant with a Full Scale IQ score of 66, indicating mild mental retardation; a verbal

comprehension score of 68; a perceptual reasoning score of 69; a working memory score of 80;

and a processing speed score of 71. (R. 325). Dr. Goff also noted a score of 65 on the general

ability index, falling within the mildly retarded range.  During the Reitan-Indiana Aphasia

Screening Test, the claimant could read a sentence on the fourth grade level and was unable to

perform simple mathematical calculations either mentally or on paper.  Dr. Goff also

administered the Wide-Range Achievement Test-IV, on which the claimant tested at a fourth

grade level in math computation and sentence comprehension. The claimant tested at a third

grade level in spelling and word recognition. (R. 326).

Although Dr. Goff noted that the claimant's educational records were incomplete, he indicated that he had no reason to doubt that the claimant had been in special education classes. He stated that the claimant's "academic achievement levels suggest deficits in functional academics.  His mathematical calculations are poor to an extent that he may have difficulty managing his financial affairs [and] . . . [that he] most likely depends on others for matters of judgment and some interactions in the community." (R. 326).  Based on the results of all the tests, Dr. Goff determined that the claimant's deficits in adaptive functioning represented severely limiting impairments. (R. 327).  Ultimately, Dr. Goff diagnosed the claimant with mild mental retardation and adjustment disorder with mixed features, including enhanced somatic concern and reading disorder. (R. 327).

Dr. Goff also completed a Medical Source Statement (Mental) on August 1, 2011, regarding the claimant's ability to function in the workplace. In his report, Dr. Goff opined that the claimant had marked restrictions in constriction of interests; ability to understand, remember and carry out repetitive tasks; ability to maintain attention and concentration for extended periods; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to sustain a routine without special supervision; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; ability to make simple work-related decisions; ability to respond appropriately to changes in the work setting; ability to respond to customary work pressures; and ability to be aware of normal hazards and take appropriate precautions.  He also found that the claimant had moderate limitations in his ability to interact appropriately with the general public; in his ability to perform his daily activities; in his ability to understand, remember and carry out simple

instructions; and in his ability to respond appropriately to supervision. (R. 328).

*The Administrative Hearing (Re: Mental Limitations)*

On August 18, 2011, the ALJ held a video hearing with the claimant. At the hearing, the claimant testified about his physical impairments; however, this court will only discuss testimony regarding the claimant's mental limitations because only they are at issue.

The claimant testified that his daily activities included cooking, doing laundry, doing household chores, and working in his yard. The claimant testified that he enjoyed watching basketball games on television and shows like *60 Minutes*. The claimant stated that he had no problem following those programs or remembering what he read and watched. The claimant testified that he attended church approximately once a month and that he got along with his family and friends. The claimant also stated that he regularly played dominoes with friends and was able to count his own points. (R. 53-54).

Next, the ALJ questioned the claimant about his social activity. The claimant testified that he did not have any problems being around other individuals or leaving his home. The claimant testified that he had never had a driver's license because he failed the written portion of the test three times. The claimant stated that, at past jobs, he did not require any kind of special help or special supervision in performing those jobs and that he had no problem adapting to change. However, the claimant did testify that he has had problems with handling his stress in the past. (R. 59).

The claimant testified that he left school in the tenth grade because his girlfriend was pregnant. Upon leaving school, the claimant took GED classes but never completed those classes. The claimant also testified that while he was in school, he was held back in both the third and

10

sixth grades, and that the school put him in special education classes for his sixth grade year. (R. 63-65).

The claimant stated that the last place he worked was Singleton Construction, and that he left that job on July 27, 2009, because it was a temporary job that ended. (R. 48). Regarding the claimant's performance of substantial gainful activity after his alleged onset date, the claimant testified that, in 2010, he worked one day at Delta Force Products as a machine operator, but could not do that job because his knee kept swelling. (R. 49). However, other than that one day of work, he had not had any income other than unemployment. The claimant also testified that he currently receives food stamps. (R. 66).

The ALJ then examined the vocational expert, Renee Smith. Ms. Smith testified concerning the type and availability of jobs that the claimant could perform. The ALJ posed several hypothetical situations to Ms. Smith. First, the ALJ asked her to assume an individual with the same age, education and past relevant work experience as the claimant, with the following limitations: could stand or walk two hours in an eight-hour day; could sit six hours in an eight-hour day; could lift or carry ten pounds occasionally and less than ten pounds frequently; could never push/ pull with the right lower extremity; could never climb ladders, ropes and scaffolding; could occasionally balance, stoop, kneel, crouch, and crawl; must avoid all exposure to hazards and unprotected heights; and must avoid exposure to dust, fumes, odors, gases, poor ventilation, extreme cold, extreme heat, wetness, humidity, and vibrations. Ms. Smith testified that, based on those limitations, such an individual would not be able to perform any of the claimant's past relevant work. (R. 69). However, Ms. Smith testified that such an individual could work sedentary, unskilled jobs, such as a nut sorter, with 400,000 jobs available

11

nationally and 7,000 in Alabama; a cuff folder, with 500,000 jobs available nationally and 9,000 in Alabama; or a button reclaimer, with 400,000 jobs available nationally and 7,000 in Alabama. (R. 70).

The ALJ then asked Ms. Smith to assume another individual of the same age, educational background, and past relevant work experience as the claimant who cold perform sedentary work, with the additional limitation that the individual would need a cane to ambulate long distances. She testified that each of the previously mentioned jobs would still be available to an individual under those circumstances. (R. 70).

Next, the ALJ took the hypothetical one step further by adding a limitation that the individual can only occasionally maintain concentration, persistence, and pace through an eight-hour workday. In response, Ms. Smith testified that such an individual would not be able to perform any of the jobs previously mentioned, nor any other jobs in the national economy. (R. 71).

The claimant's attorney then asked her what jobs would exist in the national economy if the claimant needed to keep his right leg elevated while in a sitting position. Ms. Smith responded that if the individual is required to elevate his leg, such an individual would not be able to perform any jobs in the national economy. (R. 71)

*The ALJ Decision*

On September 23, 2011, the ALJ issued a decision finding that the claimant was not disabled under the Social Security Act. (R. 30). First, the ALJ found that the claimant had not engaged in substantial gainful activity since the alleged onset of his disability. Then, the ALJ found that the claimant suffered from the severe impairments of "status post two knee surgeries

12

and osteoarthritis in the right knee; alcoholic hepatitis; and possible borderline intellectual functioning." (R. 21). The ALJ concluded, however, that his sickle cell anemia, hypertension, and gatroesophageal reflux disease are nonsevere, as they are either controlled by medications or present no disabling symptoms. The ALJ then concluded, however, that these impairments did not singly or in combination manifest the specific signs and diagnostic findings required by the listing impairments. (R. 21).

The ALJ found that the claimant suffered from the severe impairment of possible borderline intellectual functioning. In her decision, the ALJ recognized that the claimant alleged that he met Listing § 12.05(C)(Mental Retardation) based on Dr. Goff's findings and assessed IQ score of 66 for the claimant. However, the ALJ explained that, for the claimant to satisfy Listing § 12.05(C) requirements, the claimant's mental impairment must satisfy the diagnostic description of mental retardation set forth in the introductory paragraph. This introductory paragraph defines mental retardation as referring to "[s]ignificant subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates of supports onset of the impairment before age 22." (R. 21-22).

Next, the ALJ considered the claimant's testimony that he was in special education classes for his sixth grade school year; that he repeated the third and sixth grades; and that he failed several high school courses. She noted that, although the claimant failed most of his high school courses, he was not placed in special education classes at that time. The ALJ also took into consideration that, during high school, the claimant's standardized test scores showed that the claimant was reading at a fifth grade level and that his math skills were at a fourth grade level. (R. 21). However, the ALJ concluded that the claimant did not have "[s]ignificant subaverage

general intellectual functioning" as required by the introductory paragraph of Listing 12.05, and, therefore, the claimant did not have an impairment or combination of impairments that met or equaled the requirements for Listing 12.05(C). (R. 22).

The ALJ supported her conclusion by stating that, although the claimant "failed various subjects in school, does not drive because he was unable to pass his driver's license test, and had standardized test scores that he was performing at a lower grade in math and reading," the claimant was able to recite dates and facts with little difficulty at the hearing. (R. 23). The ALJ also noted that the claimant testified that he could do household chores, pay his bills, do yard work, visit friends, and travel alone. In addition, the ALJ noted that the claimant testified that he was able to follow written and spoken instructions very well; worked various jobs, some of which were semi-skilled; could follow television shows with no problems; left his last job because he dropped out, not because he could not perform the functions of the job; and dropped out of high school because his girlfriend was pregnant, not because he could not complete the work. The ALJ stated that, "although the claimant may have borderline intellectual functioning . . . he does not have significant difficulties coping with common life demands or meeting the standards of personal independence." (R. 23).

The ALJ then discussed the claimant's examination with Dr. Goff, an evaluating neuropsychologist. The ALJ stated that, other than his IQ score of 66, no other evidence supported Dr. Goff's diagnosis of mild mental retardation. The ALJ also noted the inconsistencies between Dr. Goff's report and the claimant's testimony. During the examination, the claimant told Dr. Goff that he left his last job because of knee pain; however, at the hearing, the claimant stated that his last job was a temporary job that ended. The ALJ further noted that

Dr. Goff diagnosed the claimant with functional illiteracy; however, in the claimant's Function Report, the claimant stated that he was able to follow written and spoken instructions "very well." (R. 23). The ALJ also discussed Dr. Goff's opinion that the claimant would have difficulty managing his financial affairs; however, in the claimant's Function Report, the claimant stated that he is able to pay bills, count change, and handle his savings and checking accounts.  In his function report, the claimant indicated that he handled stress well, got along with authority figures, adapted easily to changes in a routine, and regularly spent time with friends.  The ALJ noted that these answers are not consistent with an individual suffering from a severe adjustment disorder. (R. 24).

The ALJ also discussed Dr. Goff's Medical Source Statement (Mental) regarding the claimant's ability to function in the work place. The ALJ found that the Medical Source Statement was not supported by the claimant's own statements in the record, and that the record indicated that the claimant does not have such a severe limitation in those areas. The ALJ noted that, in his Function Report, the claimant stated that he had hobbies, enjoyed spending time with friends, watched television programs, read the newspaper, and had performed semi-skilled jobs in the past with no problems. The claimant further stated that he handled stress very well, could pay attention "all day," and had no problem finishing what he started.   The ALJ also pointed out that, although Dr. Goff found that the claimant could only read on a fourth grade level and could only do simple math problems, the claimant was able to read and complete his Function Report and other disability paperwork.  Based on these inconsistencies, the ALJ assigned little weight to the diagnoses and Medical Source Statement (Mental) of Dr. Goff. (R. 25).

After considering the entire record, the ALJ concluded that the claimant had the RFC to

15

perform sedentary work as defined in C.F.R. § 404.1567(a) with the following limitations: can stand/walk two hours in an eight-hour day; can sit six hours in an eight hour day; can lift ten pounds occasionally; can lift less than ten pounds frequently; can never push or pull with right lower extremity; can never climb ladders, ropes or scaffolding; can occasionally balance, stoop, kneel, crouch and crawl; must avoid all exposure to dust, fumes, odors, gases, poor ventilation, extreme cold, extreme heat, wetness, humidity and vibration; can understand, remember and complete short simple tasks; and must use a cane to ambulate long distances. (R. 25).

The ALJ subsequently found that, based on the vocational expert's testimony, the claimant was unable to perform any past relevant work, and no transferable skills existed within the sedentary range. However, the ALJ found specifically that the claimant, given his RFC, could work as a nut sorter, cuff folder, or button reclaimer, and that, given the vocational expert's testimony, those jobs existed in significant numbers in the national economy. Therefore, the ALJ ultimately determined that the claimant was not disabled under the rules of the Social Security Act. (R. 30).

**VI. DISCUSSION**

**Substantial evidence does not support the ALJ's finding that the claimant did not meet Listing § 12.05(C).**

The claimant argues that the ALJ did not provide substantial evidence to properly find that the claimant did not meet Medical Listing § 12.05(C) for "mental retardation." This court agrees and finds that substantial evidence does not support the ALJ's reasons for improperly discrediting the medical opinion of Dr. Goff and the IQ score of the claimant.

For the claimant to meet Listing § 12.05(C), he must show that he has "significantly subaverage general intellectual functioning with deficits in adaptive functioning" that manifested

16

before the age of twenty-two by providing the court with evidence of (1) "a valid verbal, performance, or full scale IQ of 60 through 70" *and* (2) "a physical or other mental impairment imposing an additional and significant work-related limitation of function." Listing § 12.05(C). Evidence of the claimant's IQ score, and, thus, his presumptive deficits in adaptive functioning, may be rebutted *if* the record evidence, including medical evidence, is inconsistent with his daily activities and behavior. *Popp v. Heckler*, 779 F.2d 1497, 1499-1500 (11th Cir. 1986). The ALJ should consider the IQ score and its accompanying narrative report, in conjunction with other medical evidence and the claimant's daily activities, to rebut the presumption. *Id.*

As to the first criteria outlined in Listing § 12.05(C), the claimant in this case proffered evidence of a valid full scale IQ score of 66, resulting from an IQ test administered by Dr. Goff on July 27, 2011. (R. 325) This IQ score raises the rebuttable presumption that the claimant manifested deficits in adaptive functioning prior to the age of twenty-two. *See Hodges v. Barnhart*, 276 F.3d 1265, 1268-1269 (11th Cir. 2001).

Despite this presumably valid IQ score of 66, the ALJ stated that, other than that score, no other evidence existed to support Dr. Goff's mild mental retardation finding. The ALJ supported this conclusion by stating that the claimant's various failed subjects in school, inability to pass his driver's license test, and extremely low standardized test scores did not suffice to establish the requisite "significant subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period" to meet Listing § 12.05(C). The court disagrees and finds that the ALJ's reasons for discrediting Dr. Goff's findings and the claimant's testimony are not supported by substantial evidence.

First, in discrediting the claimant's IQ score, the ALJ failed to address Dr. Goff's specific

17

findings regarding the validity of the IQ score.  Dr. Goff, a neuropsychologist, has expertise in

clinical psychology and neuropsychology, and has served as medical expert for the Social

Security Administration in the past.  (R. 216).  He gave a detailed analysis in his report about the

importance of the validity of IQ scores for disability determination purposes, and specifically

found that the claimant was not malingering or engaging in dissemination.  (R. 325).  Yet, the

ALJ chose to disregard Dr. Goff's medical opinion based solely on the claimant's testimony and

statements.

Moreover, the court notes that Dr. Goff's mental assessment, and corresponding IQ

score, was the *only* mental assessment in the record; the ALJ had no other medical evidence on

which to base his rejection of Dr. Goff's findings.  Dr. Goff, based on his expertise as a clinical

psychologist and neuropsychologist, examined the claimant's medical history, statements, and

test results, and concluded that he had marked restrictions and severe limitations in many areas of

functioning.  Because no other medical opinion asserting knowledge of the claimant's mental

abilities and limitations exists in the record, and because Dr. Goff's narrative report

accompanying the claimant's IQ scores affirms the validity of the scores, the ALJ erred when he

disregarded Dr. Goff's medical opinion and IQ score of 66 based solely on the claimant's

statements in his Function Report.

For substantial evidence to exist and support an ALJ's decision to discredit a

psychologists's medical opinion, additional *medical* evidence must exist in the record to support

the ALJ's findings.  In *Perkins*, the Eleventh Circuit found that substantial evidence supported

the ALJ's decision to discredit a medical opinion when the ALJ found that the medical opinion

was "inconsistent with *other medical opinions*," as well as being based on "contrary claims by

[the claimant]." *Perkins,* 2014 WL 223905, at *3 (emphasis added). Additionally, when the Eleventh Circuit has found that an ALJ properly discredited or gave less weight to an IQ score because the claimant's daily activities and behavior were inconsistent with the score, the ALJ also had other medical evidence in the record to support his mental limitation findings. In *Hickel*, the claimant worked part-time, drove, attended church regularly, took special education classes and graduated from high school. *Hickel.,* 539 F. App'x at 984. The Eleventh Circuit in *Hickel* held that the ALJ properly found that the claimant lacked the requisite level of deficits in adaptive functioning, rebutting the presumption raised by the IQ scores, because *five separate medical opinions* attested to the claimant's ability to function at a higher level than the claimant's IQ scores represented. *Id*. at 985. In *Smith,* the ALJ properly discredited the claimant's IQ scores because the *administering doctor* believed that her scores underestimated her intelligence, and because of the claimant's own testimony that she had average intelligence, no problems in school, and no problems with abstraction, problem solving, or thought processes. *Smith v. Comm'r of Soc. Sec.,* 535 F. App'x 894, 897-898 (11th Cir. 2013).

No such medical evidence exists in the present case. Moreover, the ALJ in *Popp* properly discredited the claimant's IQ scores because, not only did the claimant teach high school algebra and was about to complete the requirements for a bachelor of science degree, *two medical opinions were in conflict* and both commented on the claimant's tendency to exaggerate answers and appear untruthful. *Popp v. Heckler,* 779 F.2d 1497, 1499-1500 (11th Cir. 1986). Dr. Goff specifically stated in the present case that the claimant was not malingering or engaging in dissemination.

Rather than merely discrediting Dr. Goff's medical opinion and the inclusive IQ scores

without any basis from a conflicting medical opinion, the ALJ should have ordered a consultative examination to quiet any doubts the ALJ held about the claimant's mental disability and IQ score. Because the ALJ has a duty to develop the record fully and fairly, "it is reversible error for an ALJ not to order a consultative examination when such an evaluation is necessary for him to make an informed decision." *Holladay v. Bowen,* 848 F.2d 1206, 1209-10 (11th Cir. 1988). The ALJ's duty to order a consultative examination can be triggered when an inconsistency in the evidence exists or the medical record as a whole does not support a determination on the disability claim. 20 C.F.R. § 416.903(a); 20 C.F.R. § 416.919. The ALJ in the present case needed a consultative examination from another mental health expert to provide substantial evidence to disregard Dr. Goff's findings.

If the ALJ ordered a consultative examination and the ALJ found that the opinion conflicted with Dr. Goff's opinion, substantial evidence might exist to support the ALJ's decision to accord less weight to Dr. Goff's opinion and the inclusive IQ score. But, by simply rejecting a medical opinion from a mental health expert regarding the claimant's mental functioning, without other existing medical opinion by a mental health expert, the ALJ improperly placed himself in the shoes of a physician. *See Maybury v. Sullivan*, 957 F.2d 837, 840 (11th Cir. 1991) (Johnson concurring) ("[a]n ALJ . . . abuses his discretion when he substitutes his own uninformed medical evaluations for those of a claimant's treating physicians."). Although Dr. Goff is not a treating physician in the instant case, he is the administering physician and the *only* physician to provide an opinion as to the claimant's mental disability. As such, the court finds that substantial evidence did not support the ALJ's rejection of Dr. Goff's opinion regarding the claimant's limitations.

Instead of securing a consulting examination from another mental health expert, the ALJ found that the claimant's IQ score indicating mild mental retardation was inconsistent with the claimant's own testimony regarding his ability to function in his daily life.  To support his conclusion that the claimant did not have deficits in adaptive functioning, the ALJ relied on the following facts: that the claimant was "an excellent historian" and was able to quickly recall facts and dates at the hearing; that he could watch television shows and remember what he watched; that he could clean and cook; that he was able to read newspapers and remember what he read; that he did not drop out of school because of his inability to complete the work, but because his girlfriend was pregnant and he needed to find work; that the claimant told Dr. Goff that he had to stop working because of his knees but testified at the hearing that his quit working because his temporary job ended; and that, absent his physical limitations, the claimant had no mental limitation that affected his ability to perform his activities of daily living. (R. 23-24).   The ALJ also stated that the claimant's testimony and Function Report suggest that he did not have the extreme degree of limitation espoused by Dr. Goff. To support her conclusion, the ALJ stated that the claimant testified that he regularly played dominoes with his friends; had performed semi-skilled jobs in the past; followed written and spoken instructions "very well"; could pay attention "all day"; had no problem finishing what he started; and handled stress well. (R. 25).

In addition to its finding that the ALJ lacked any medical evidence in the record to support his rejection of Dr. Goff's findings, this court also finds that these instances of evidentiary support given by the ALJ do not constitute substantial evidence to support his finding that the claimant does not meet Listing § 12.05(C).  The fact that the claimant was "an excellent historian" at the hearing, could recall some facts about his life, and could clean and cook does not

21

negate an IQ of 66. The claimant's ability to recite and recall simple information and do simple tasks is consistent with mild mental retardation, and consistent with Dr. Goff's assessment of the claimant. Moreover, the ALJ stressed that the claimant dropped out of school in the tenth grade, not because the claimant could not do the work, but because his girlfriend was pregnant and he needed to work. However, the ALJ fails to make the connection that failing *nine* high school courses in his very short high school career would certainly support a finding that the claimant was unable to successfully complete his high school work.

Also, the ALJ's reliance on the claimant's inconsistent statements about why he left his last job does not support the ALJ's reasoning. The claimant testified that he left his job in July 2009 because it was a temporary job that ended (R. 48); however, the claimant also testified that he left his very last job at Delta Force Products in 2010—a job that lasted only one day—because his knee kept swelling. (R. 49). The claimant could have been referencing his job at Delta Force Products when he told Dr. Goff that he stopped working because of his knee, which would not be inconsistent with the claimant's testimony.

Moreover, the facts that the claimant could add his points when he plays dominoes and had worked at semi-skilled jobs in the past do not negate an IQ score of 66 and diagnosis of mild mental retardation. Dr. Goff indicated in his assessment that the claimant could count back from twenty, but had problems performing serial three addition, which would be consistent with the claimant's ability to count dots on the dominoes. Moreover, most of the claimant's past jobs were manual labor jobs that did not require any technical knowledge or skills of someone with a higher IQ. (R. 177-182).

Regarding the ALJ's statement that the claimant indicated in his Function Report that he

could follow instructions very well, the ALJ left off a very important aspect of the claimant's statement—the claimant actually stated that he could follow written instructions "very well, *if I can understand it*."  (R. 189).  Also, the ALJ noted that the claimant indicated in his Function Report that he could handle stress well, but failed to mention the claimant's testimony at the hearing that he has had problems with handling stress at work.  (*See* R. 59).  The court has concerns as to whether the claimant could actually understand the questions on the Function Report given Dr. Goff's assessment of the claimant's reading disorder.

Additionally, the ALJ's assertion that no other evidence in the record supports Dr. Goff's finding that the claimant has mild mental retardation lacks merit.  The record indicates that the claimant was held back in both the third and sixth grades; that the school placed the claimant in special education classes in the sixth grade; that he failed nine of his high school classes in the ninth and part of tenth grades, which would equate to most of his high school classes; and that he does not have a driver's license because he failed the written portion of the driver's test on three occasions.  Although the ALJ simply states that these reasons do not support a finding that the claimant meets Listing § 12.05(C), these facts certainly support Dr. Goff's finding that the claimant has an IQ of 66, and, thus, mild mental retardation. (R .63).

As such, the record in this case lacks supporting medical evidence to provide substantial evidence for the ALJ to reject Dr. Goff's findings.  Therefore, the court finds that the ALJ did not provide substantial evidence to reject Dr. Goff's medical opinion because he validated the claimant's IQ score in his narrative report and no additional medical evidence conflicted with Dr. Goff's medical opinion.

## VII. CONCLUSION

For the above reasons, this court concludes that the ALJ failed to provide substantial evidence to support his conclusion that the claimant does not have an impairment or combination of impairments that meets or medically equals Listing § 12.05(C). Therefore, this court will REVERSE and REMAND the Commissioner's decision for the ALJ to take action consistent with this opinion.

The court will enter a separate Order in accordance with this Memorandum Opinion.

DONE and ORDERED this 23rd day of September, 2014.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE